SAMUEL BENNETT, RESPONDENT, *v.* TINTIC IRON COMPANY, APPELLANT.

PRACTICE.—IMPANELING JURY.—OPEN VENIRE.—Where it appeared that on the day on which the case was set for trial the defendant appeared and requested a postponement of ten days, on account of the absence of his counsel, which was granted, with the statement from the court that on that day to which the case was postponed the regular panel of the jury would be discharged and he would need to summon a special jury on an open venire, and the defendant made no objection thereto but acquiesced therein, *held* that the summoning of a special jury upon open venire, while the regular jury list was exhausted was not error.

EVIDENCE.—PERSONAL INJURY.—NEGLIGENCE.—USUAL WORKING.— A question (asked of a witness, the foreman of the mine, in regard to an accident caused by a shot being put in and exploded, which left the rock loose, and was in this way the

cause of plaintiff's injury by the rock falling on him where it was left loo-ened) " whether or not putting in this shot so far as you have observed it and the examination you have made, · if that is different in any way from the usual method of working and examining the mine," was properly excluded.

MASTER AND SERVANT.—FELLOW SERVANT.—NEGLIGENCE.—*Semble* that where the negligence complained of was the unsafe condition of the premises and the proof shows that the premises were examined by a fellow-laborer of plaintiff, who reported to the foreman that the premises were safe, and thereupon the foreman ordered the plaintiff into the unsafe place and the plaintiff was there injured, *held*, that the negligence was that of a fellow-servant of plaintiff.

ID.—ID.—ID.—STATEMENT OF CASE.—Three men were working in a certain place in the mine under a foreman, one of them the plaintiff, sorting ore, the other two drilling a hole to put in a shot; when they were ready to fire the shot, plaintiff was notified and retired with the horse and cart he was using to a place of safety. After the shot was fired, plaintiff returned to within a rod of the place, and then H., one of the miners under the direction of G., the foreman, examined the place carefully, and came down again, whereupon G., the foreman, relying upon the examination of H., who was an old and experienced miner, ordered plaintiff into the place; plaintiff then assisted in hauling away several loads of waste, when the bank above the place where they were working fell down; plaintiff was either knocked over or jumped over the edge of the roadway into a pit 70· to 75 feet deep, the fallen rock having filled up the roadway to within two feet of the edge. Plaintiff had never worked in the mine before. He was seriously injured. *Held*, that there was no evidence of negligence to submit to the jury, and if there was any negligence it was that of H., a fellow-servant of plaintiff.

APPEAL from a judgment of the district court of the first district and from an order refusing a new trial, Hon. John W. Blackburn, judge. The opinion states the facts, except that the facts as stated *infra* in respondents brief are found in the abstract. The record showed that the list of 200 names was exhausted.

*Messrs. Williams and Van Cott,* for the appellant.

They cited as to the question of impaneling the jury.
*Mossean* v. *Veeder,* 2 Or. 113; *Judge* v. *State,* 8 Ga. 173;
*De Pont* v. *McAdow,* 6 Mont. 226; *Williams* v. *Comm.,* 91
Pa. St. 493, 12 Am. and Eng. Encyc. 340–2. The miner
was a fellow-servant. *Railway Co.* v. *Baugh,* 13 Sup. Ct.
Rep. 914. Defendant had the right to show by witness
Gundy that the work was done in the ordinary way of
careful and prudent men.

*Messrs. King and Houtz,* and *Mr. Samuel R. Thurman,*
for the respondent.

The negligence complained of was the superficial examina-
tion of the bank after the shot was fired. The bank con-
sisted here partly of an old dump. The lower part of the
bank was porphyry with seams of talc traversing it in all
directions, while the upper half consisted of boulders and
other loose materials (Ab. pp. 19, 21, 29, 33).

After the shot Gundy thought there might be a slide
(Ab. 27), and made a superficial examination (Ab. 29).
The quantity of earth brought down by the blast was not
great. An examination at the point where the shot "had
been fired" revealed the existence of cracks or fissures in
the bank (Ab. 29, 30, 32, 35) radiating from the point of
explosion. These crevices were caused by the blast and
extended into the bank. Above the point where the hole
was drilled the foreman examined slightly the crevice, but
below and parallel with the road, no examination whatever
was made (Ab. 35). This testimony comes from defendant's
witness. Bennett was directed by the foreman to com-
mence the work on the precipice, below the bank where
the crevices were, without any examination by the foreman
of the dump above the point of explosion (Ab. 29), or an
investigation of the crack continuing below it to the base

of the bank (Ab. 34, 35), "although the crack ran down to the level of the road" (Ab. 34).

This suit is brought by plaintiff to recover damages for the injuries sustained. He alleges in his complaint that the defendant was guilty of negligence in exploding a shot in the bank and creating a crevice and in suffering the bank to remain in a dangerous condition knowing of the existence of the said crevice and the precipice, and directing the plaintiff to work upon said road at a point between said crevice and said precipice without advising him of the danger thereof. Bennett did not assume the risks resulting from the negligence of his employer. The foreman Gundy was a vice principal and any negligence which he permitted or was guilty of was not that of a fellow servant. The doctrine of fellow-servant cannot apply to the duty of the employer to furnish a reasonably safe place to work. *Pidcock* v. *Railway Co.,* 5 Utah, 616; *Trihay* v. *Mining Co.,* 4 Utah, 486; *Reddon* v. *Railway Co.,* 5 Utah, 354; *Seley* v. *Southern Pacific Co.,* 6 Utah, 321; *Hough* v. *Railway Co.,* 100 U. S. 214; *Bowers* v. *Railway Co.,* 4 Utah, 215. Plaintiff was entitled to rely upon the directions of defendant's foreman as to the safety of the place. *Hawkins* v. *Johnson,* 105 Ind. 39; *Harrison* v. *Railway Co.,* 7 Utah, 523; *Keegan* v. *Kavanaugh,* 62 Mo. 230; *Leary* v. *Railroad Co.,* 139 Mass. 580; *Cole* v. *Railway Co.,* 71 Wis. 114, and numerous other Utah cases were cited upon the question of negligence.

SMITH, J.:

This is an appeal from a judgment in favor of the plaintiff, and against the defendant, for the sum of $5,000, rendered May 17, 1892, and for costs. The damages were awarded for a personal injury alleged by plaintiff to have been sustained by him while in the employ of the defendant, caused by the negligence of the defendant. Three

assignments of error are made upon this appeal: First, that. the court below erred in overruling the defendant's challenge to the panel of the trial jury; second, that the court. erred in sustaining plaintiff's objection to a certain question asked of the witness William Gundy by defendant's. counsel; and, third, that the evidence was insufficient to justify any verdict in favor of the plaintiff, and against the defendant.

Upon the first error assigned, to wit, the overruling of defendant's challenge to the panel of the trial jury, the. following facts appear in the record: The case was set down for trial on the 9th day of May, 1892, in its regular order,. upon the calendar of the court. That it was or would have been reached upon the call on that day, but on the 7th day of May the defendant appeared in court, and requested that the trial be postponed to the 17th on account of the absence of defendant's attorney. This was objected to for the reason that it might result in a continuance of the case for the term, as the jury trials were about concluded.

When the challenge was made the court made the following statement, which was not disputed, and which appears in the record: "The fact is this: The remark I made when it was set for the 17th was that perhaps the jury would be discharged before then, but that if it was. we would issue a special venire, and I would continue the. case to that time. There was nothing said on either side. in the way of objection to this." The challenge was upon the ground that the jury had been summoned especially to. try this particular case. It seems that by reason of the. postponement of the case to the 17th the regular calendar of jury cases was concluded several days before that. date, and the regular jury in attendance was discharged. When the day arrived for the trial of this case, in accordance. with the statement of the court just quoted, a venire was.

issued for a jury to try the case, and it was challenged upon the ground stated by the defendant as follows: "Defendant now challenges the entire panel of the jury in the box, called in this case, and examined upon their *voir dire,* for the reason that there is no regular panel for the term of this court in attendance at this time; that the jury that has been called, as appears by the records of the court, have been summoned on a special venire this date issued and served by the marshal, he making the selection of jurors himself; and, further, that the said jury is not a regular panel selected from the lists for jurors for the term provided under the territorial statute, or by any other method, as a regular panel for the present term of this court."

Counsel for defendant stated, in connection with the challenge, that he had no objection to the personnel of the jury. We do not think the court erred in denying this challenge. There is abundant authority for holding that where there is no intimation or charge of bad faith the court has the power, whenever the necessity arises, and there is no regular jury in attendance, to impanel a jury to try a case which has been properly set, and is ready for trial to a jury. See *Mackey* v. *People,* 2 Colo. 13; *Stone* v. *People,* 2 Scam. 335; *Vanderwerker* v. *People,* 5 Wend. 530; *Hunt* v. *Scobie,* 6 B. Mon. 469; *Reed* v. *State,* 15 Ohio, 217. We do not intend, in this case, to declare the rule that the court can capriciously break up the regular panel, and require parties to submit their controversies to an unsatisfactory array of jurors summoned upon a special venire. But in this case there is no pretense of bad faith on the part of the court, or of the plaintiff. If the defendant desired to object to the arrangement contemplated, of summoning a special jury, it should have given some intimation of its objection at the time it was first suggested by the court, when the

defendant was asking a postponement of the trial. The defendant sat by, and took advantage of the postponement when it was given to it, when it was particularly announced that one of the conditions would be that the case would have to be tried by a special jury.

We believe the doctrine of equitable estoppel should prevail upon a question of practice in a case like this. If the party sits by, and, without objection, hears an arrangement made in court for his own advantage, and at his own instance, he should not afterwards be heard to complain of some particular part or detail of that arrangement. In this case, if the defendant desired a trial by the regular panel, it should have gone to trial at the time the case was first set. Instead of doing this, it asked a postponement, which it was foreseen would result in exactly what did happen, and which was at the time suggested, and the purpose of the court to summon a special jury was at the time fully expressed and declared. No objection was made. The continuance or postponement was accepted. Under such circumstances, we do not believe the defendant ought to be heard, in this court, to complain of the arrangement, inasmuch as it further appears that the jury was unobjectionable, and the whole proceeding, so far as the court was concerned, was fair.

The second error assigned is the ruling of the court sustaining an objection of the plaintiff to a question asked by defendant's counsel of the witness William Gundy. The question was as follows: Defendant having produced the witness William Gundy, who was foreman for defendant, and who was present at the time of the accident, asked him this question: "I will ask you to state whether or not, putting in this shot, so far as you have observed it, and the examination you have made, if that is different in any way from the usual method of working and examining the mine?" This was objected to and the objection

was sustained. The ruling of the court is assigned here as error. We think the objection was properly sustained. While it is true that the evidence discloses the fact that the plaintiff had worked about the mine, altogether, some eight months before the accident, it does not appear that he ever before this time examined or knew anything about the manner in which shots were put in, and the examination made after they had been fired. The question, in effect, is whether or not this shot was put in, and the examination made, in the usual method in that mine. Now, the usual method may have been a negligent one, and, unless the plaintiff knew that such negligence was usually indulged in, such testimony would not be material. There is nothing to show that he did know it. We think it was proper for the court to permit the circumstances of the transaction to be fully detailed, as was done in the evidence. But whether this transaction was like other transactions usually occurring in that mine would certainly not enlighten the jury as to whether it was negligent or not negligent, in itself.

The third objection urged here relates to the sufficiency of the evidence to sustain the verdict. We have made a most careful examination of the evidence in this case, and the facts are as follows: The defendant was operating an iron mine at Tintic. It was worked as an open cut on the side of the mountain. The ore was extracted from a wide vein by quarrying it out or blasting it. At the bottom the mine was carried in on a level, and the face or breast of ore becoming accordingly higher as further progress into the mine was made. At the time of the accident the lower level or bottom of the mine was something like 100 feet at the face or breast of ore below the surface of the ground. About 70 or 75 feet up the face of this breast was a roadway cut along across the ore body. Above this roadway were rock and waste matter, and some ore. In working

the mine the practice was to work all that part of the ground above the roadway, being about 30 feet in depth, by blasting it down, working out the ore that was in it, and hauling off the waste at the roadway. Then the ore matter below the roadway, and down to the lower lever, was blasted down, and carried away from the lower level.

On the day of the accident, plaintiff was engaged, first, in sorting ore on the roadway, while two fellow-laborers, Hawkins and Rundquist, were engaged in drilling a hole to put in a shot. When they were ready to fire the shot, plaintiff was notified, and he retired to a place of safety, taking with him the horse and cart which were used to haul away the waste. After the shot was fired the plaintiff came back to within about a rod of the place, and stood waiting while Hawkins, under the direction of Gundy, who was foreman for the defendant, made an examination of the bank and ground for the purpose of ascertaining if they were safe. This examination appears to have been made by Hawkins, on this occasion, in the following manner: He went up on the surface of the ground some 30 feet above the roadway, and drove a crowbar in the ground, to which he attached a rope, and by means of this rope climbed down over the face of the precipice or bank above the roadway. He had with him a crowbar or pick for the purpose of prying out and throwing down any material that was loose, or liable in any way to fall. Hawkins describes the work, in his own language, as follows: "I drove a drill back of the bank, and made my rope fast to it, and came down and over, and worked the loose rock down. I used the rope to hold myself right along that brow. From there I looked down, and examined all portions of the ground disturbed by the blast. I worked with a pick and a crowbar. I worked down all the loose rock that I could get out there. That was after examining below on the roadway."

The shot was put in just above the level of the road-way. After the examination had been made, and all the loose rock worked down by Hawkins, Gundy ordered the plaintiff to come on, and go to work hauling the waste. The language of Gundy, according to plaintiff's own state-ment, was as follows: "Come on, Sam. It's all right. Bring in the cart." Plaintiff backed the cart in, and, in connection with Hawkins and Rundquist, began loading it with waste. Several loads of waste were hauled out, plaintiff driving the cart and assisting to load it. After three or four loads had been hauled, while they were loading the cart, the bank above the roadway seems to have slipped and fallen down on the roadway, filling it up to within about two feet of the edge next to the pit below. Rund-quist and Hawkins were not hurt, but the plaintiff was either knocked over or jumped over the precipice, and fell to the lower level, some 70 or 75 feet, and was seriously injured. This statement of the evidence, we believe, em-bodies as strong a presentation of it as can properly be made in favor of the plaintiff. There was some evidence that there was a crack parallel to the roadway, extending a few feet from where the shot was put in. It appears to have been one of several cracks around the point where the shot had been put in. It was seen and examined by Hawkins and the foreman.

It is claimed by the plaintiff that, had another shot been put in, it would have thrown the bank down, and would have prevented the accident, inasmuch as the plaintiff would not have been present when the shot was fired, and after another shot the bank could not have slipped. This contention may be reasonable, but it is certainly not founded upon anything in the evidence. There is no one who tes-tifies that the putting in of another shot would certainly have prevented the accident. In fact, it seems to us im-possible that any one should have known whether it would

or not. It does appear clearly, from the testimony, that Hawkins made the examination of the bank, under the direction of the defendant's foreman, for the purpose of ascertaining whether or not it was safe. He appears to have been a competent man for that business. He had been engaged in mining for 30 years, and was fully qualified to perform the work to which he had been assigned. In fact, no complaint was made as to his competency. Now, if it be admitted that upon this occasion he neglected to make so thorough an examination as he should have done, is the defendant chargeable with his neglect? He was unquestionably the fellow-servant of the plaintiff, and it is a familiar rule that the employer is not responsible for the neglect of a fellow-servant of plaintiff, when he has exercised due care in the selection of the fellow-servant. In this case the defendant directed Hawkins to examine and see if the bank was safe. He made the examination, which he testifies was thorough, and pronounced it safe. Defendant's foreman directed plaintiff to come on, and go to work; that it was all right. There is no doubt but that Gundy, the foreman, relied upon Hawkins' statement as to the condition of the bank, for he himself had not examined it, and was not accustomed to examine it.

It is difficult to conceive upon what theory the jury concluded that the defendant was guilty of negligence, or what particular act of negligence the defendant was guilty of. The work in which plaintiff was engaged was extremely hazardous, but the hazard and danger were open and obvious. When plaintiff accepted the employment, the risks naturally and ordinarily incident to the employment he assumed. He went to work upon this narrow roadway, above a precipice 75 feet high, in the business of blasting down and carting away under the precipice immediately above him. It was patent to the plaintiff, or any other

reasonable person, that, in blasting down the wall of rock above the roadway, it was liable to give way; rocks were liable to be shaken loose, and roll down; or, in numerous other ways, plaintiff was liable to be knocked off of the narrow roadway or ledge on which he was at work. The plaintiff had worked considerably at the mine on previous occasions, and he fully understood the great hazard of the employment he took. He had a right to rely upon the legal obligation of the defendant to use ordinary care to protect him. Under the circumstances, it would seem that in this case that care was exercised. It is impossible for us to conclude that there was any negligence on the part of the defendant in the working and management of this mine, according to the evidence in the record before us. If the evidence was conflicting, if there was any dispute about the details or circumstances as to what occurred, if any state of facts sustained by the evidence would indicate negligence on the part of the defendant, it would be our duty to sustain the verdict of the jury. We are unable to find anything in the facts of this case that will warrant us in affirming the judgment. The judgment is reversed, and remanded to the court below, with directions to grant a new trial.

ZANE, C. J., and MINER, J., concurred.